[Cite as *State v. Armstrong*, 2024-Ohio-1277.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

      Plaintiff-Appellee/      :
      Cross-Appellant,                 No. 112711

v.                                      :

DARON ARMSTRONG,                        :

      Defendant-Appellant/     :
      Cross-Appellee.

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; REVERSED IN PART;
             AND REMANDED
**RELEASED AND JOURNALIZED:** April 4, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-652253-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Michael Lisk and Kristen Hatcher, Assistant
Prosecuting Attorneys, *for appellee/cross-appellant.*

John F. Corrigan, *for appellant/cross-appellee.*

ANITA LASTER MAYS, J.:

{¶ 1} Defendant-appellant/cross-appellee, Daron Armstrong ("Armstrong"),

and plaintiff-appellee/cross-appellant, the state of Ohio, appeal appellant's

conviction and sentence. We affirm in part, reverse in part, and remand for further proceedings pursuant to this opinion.

{¶ 2} Armstrong was indicted on four counts on August 17, 2020. Count 1, rape, a first-degree felony under R.C. 2907.02(A)(2); Count 2, kidnapping, a first-degree felony under R.C. 2905.01(A)(4); Count 3, kidnapping, a first-degree felony under R.C. 2905.01(A)(2); and Count 4, corrupting another with drugs, a fourth-degree felony under R.C. 2925.02(A)(1). The rape count carried a sexually violent predator motivation specification under R.C. 2941.148(A). The Count 2 kidnapping charge carried under-the-age-of-18, sexual motivation, and sexually violent predator specifications, R.C. 2941.147(A) and 2941.148(A). The Count 3 kidnapping charge carried the latter two specifications. The sexually violent predator specifications were dismissed by the state prior to trial.

{¶ 3} Armstrong pleaded not guilty to the charges. Trial commenced on January 30, 2023. On February 9, 2023, the jury found Armstrong not guilty of Counts 1 and 4, rape and corrupting another with drugs, and Armstrong was convicted of both kidnapping counts. The sexual motivation specifications were tried to the bench, which found Armstrong guilty.

{¶ 4} On April 3, 2023, prior to sentencing, the trial court addressed Armstrong's motions for judgment of acquittal or for a new trial filed February 14, 2023. Armstrong argued that there was no evidence of threat or force supporting Counts 2 and 3 of the kidnapping convictions and that the stated purposes under

Count 3 were to commit rape and/or corrupting another with drugs for which the jury found Armstrong not guilty. The motions were denied.

{¶ 5} The parties agreed that the kidnapping charges merged, and the state elected to sentence on Count 2 that carried a range of three to 11 years, plus an indefinite term under the Reagan Tokes Law. The kidnapping conviction and the sexual motivation specification conviction were subject to a Tier III sexual offender designation. Armstrong was sentenced to a minimum prison term of eight years and a maximum term of 12 years on the underlying offense, declared to be a Tier III sex offender, and was awarded jail-time credit for 730 days to date.

**Trial**

{¶ 6} Jane Doe ("Doe"), 17 years old at the time of trial, testified that she was 14 years old when the incident occurred. The family resided in the Union Avenue area on the east side of Cleveland prior to moving to the adjacent Kinsman-Buckeye area. On Sunday evening, November 3, 2019, Doe returned home from a friend's house and argued with her mother. Upset, Doe left to visit friend Mary X ("Mary") several blocks away. Doe was walking along East 124th Street toward East 127th Street near Buckeye Road, south of Dave's Supermarket on Shaker Square, when an older white Cadillac began slowly following her.

{¶ 7} The car pulled up beside her, and the driver told Doe to get in. Doe complied because she was afraid of being injured though the driver did not threaten her or brandish a weapon. Doe entered the back seat of the car behind the driver that she said was cluttered with clothing, papers, and other items. Doe did not know

the driver and had never seen him before. She later identified Armstrong in a photographic lineup.

{¶ 8} Armstrong took Doe to several places where people would enter the car to purchase drugs from him. Based on signs she observed, Doe believed they visited the greater Cleveland, Bedford, and Euclid areas. Armstrong would occasionally smoke a marijuana cigarette, and "a couple of times he tried to give it" to her. "He kept asking" and at one point handed one to her. Doe blew the smoke out but did not inhale it. Tr. 497.

{¶ 9} During the incident, Armstrong asked Doe her name and age and told her he would kill her if she talked with any of the people they encountered. The next morning at approximately 6:00 a.m., Armstrong pulled into the driveway behind an apartment complex with "whitish" colored buildings in the Buckeye-Woodland area and climbed between the seats into the back seat of the car.

{¶ 10} Doe eventually removed her shirt as Armstrong instructed but refused to remove her shorts and leggings. Armstrong caused a tear in the leggings when removing them. Doe said that Armstrong penetrated her vaginally while wearing a condom. The interaction continued for 30 to 45 minutes during which Armstrong warned her to stop moving or he would kill her.

{¶ 11} Armstrong subsequently climbed back into the front seat, made phone calls and additional stops. Doe stated she could have exited the car when Armstrong pulled into a driveway and entered a house for almost an hour, but she was not sure of her location. Tr. 486. Armstrong returned to the car and smelled

like he "got in the shower, like fell asleep or something." Tr. 486. Doe could not call anyone because her broken cell phone was at home. She felt "tired," "defeated" and "traumatized." Tr. 484.

{¶ 12} Doe said she had memory lapses about portions of the incident but recalled that the driver mentioned a party while talking on the phone on Monday evening. At about 8:30 p.m., Armstrong left Doe in the car while he stopped at a liquor store in the Union Avenue area, but she did not attempt to escape. Shortly thereafter, at approximately 9:00 p.m., the driver pulled the car over and said, "[T]his is your stop." Tr. 487.

{¶ 13} Doe walked to Mary's house. She did not want to talk about what happened because she was in shock and told Mary she had passed out in a field. Doe left Mary's and was picked up by her brother who took her home. She was transported to the hospital by EMS but did not recall telling anyone what happened to her. Doe returned home and was unable to sleep, shower, eat, or get out of bed. Members of the Cleveland Police Department ("CPD") went to the house and obtained the clothes that she was wearing.

{¶ 14} The next day, Doe told her mother about the sexual assault and was transported by EMS a second time. Doe told EMS and hospital personnel about the incident and met with the police two days later.

{¶ 15} Doe testified she recognized Armstrong in the first photo lineup presented to her in 2020 but did not identify him until 2022 out of fear of retaliation toward her or her family. Doe did not see any identifying information among the

car clutter. Tr. 542. They did not stop for gas, food, or restrooms (she used an empty water bottle for toileting), and Doe did not sleep or leave the car during the almost 24-hour period.

{¶ 16} The defense emphasized conflicts between Doe's testimony and statements to police. Doe said her statement to CPD officer Natera on November 5, 2019, that Armstrong never asked her name or age and "all he called me was girl" was in error because Armstrong did inquire. Tr. 583. Doe also told police that she did not look at Armstrong during the entire period and did not identify him in a photo array until refreshing her recollection before trial though Doe also testified the delayed identification was due to fear. Doe also told EMS that Armstrong drove to the Bedford area on Monday, which conflicted with her statement to CPD Officer Natera that they went to a house on East 123rd Street that they had stopped at the prior day.

{¶ 17} The defense continued to address discrepancies between Doe's statement to the police and her trial testimony. Testimony was also elicited that around the time of the incident, Doe had stopped taking her mental health medication and her mother had urged her to go to the hospital for crisis intervention. Tr. 538.

{¶ 18} Doe told police that Armstrong had a tattoo "sleeve" on his left arm that included red ink in the design. Armstrong revealed his arms at trial. There were no tattoos on the left arm and the right arm had a tattoo on the upper bicep.

There was no red in the tattoo. Doe also did not recall other events contained in her statement to police.

{¶ 19} Doe's mother ("Mother") testified that the evening of the incident, Doe was upset with the hairstyle she received from a friend's aunt earlier that day and that her cell phone was broken. Doe did not want to go to school the next day, she and Mother exchanged words, and Doe left the house. Mother went to bed about 10:00 p.m. and learned of Doe's truancy when contacted by the school the next morning. Doe had never run away before. Mother was concerned that Mary was secreting Doe and checked Mary's house before going to juvenile court to file an unruly child report. Mother also filed a missing person's report and enlisted assistance from friends and social media.

{¶ 20} Mary contacted Mother when Doe arrived at her home and did not want to talk about what happened. Mother and Doe's brother picked up Doe who was walking home. Police and EMS arrived and took Doe to the hospital, but Doe would not speak with anyone. The next morning, Doe confirmed to Mother that she had been hurt and EMS returned Doe to the hospital where Doe disclosed the information underlying the indictments.

{¶ 21} Former CPD police officer Natera met with Doe at her home and at the hospital. The officer testified about the contents of her report:

> [W]hat she said had occurred is she and her mother had gotten into an argument. She then left the house to go to her friend's house. While she was en route to the friend's house on foot a vehicle that she described as a — like a long white car, I guess, slow rolled beside her and then a voice told her to get into the car. She was frightened and

complied. And then for the majority of the evening was being driven around by this individual who was doing drug sales in like different locations.

And then sometime approximately six a.m. he parked and, you know, crawled into the backseat and proceeded to tell her to take her clothes off. And when she hesitated, he said, I'll kill you, so she complied, except for the leggings. He ripped off the leggings. And then she — she was also made to smoke something, but she doesn't know what it was or at least at the time didn't know.

Anyway, after the assault he pretty much drove a little bit, dropped her off, and told her, I'll see you around or something, and drove off.

Tr. 801-802.

{¶ 22}  The officer also stated:

[S]he told me that the suspect was a black man with a deep voice and about chin length black dreadlocks. She said he was somewhere between five nine and five ten. She couldn't remember exactly. But she compared his height to a friend of hers. * * * She also said that he had a sleeve tattoo.

Tr. 802.  Doe indicated that the tattoo was on his left arm and said she never looked at Armstrong's face.  Tr. 821.

{¶ 23}  Sexual Assault Nurse Examiner ("SANE") Hackett conducted the sexual assault evaluation exam commonly known as the rape kit.  Nurse Hackett read a portion of the history provided by Doe for the jury:

It was about 10:00. Me and my mother got in [a] disagreement. I stormed out of the house.

I was going to my — I was going to go to my friend's on 128th Street. As I was walking on 124th, near Wendy's, I went back — I went the back way. I heard a car engine and I turned around and saw an old white — that's actually Cadillac. And then I started walking faster. And I started running. He said out the window, stop running, so I stopped because I thought he had a gun or a knife. Then he told me to get in the car. I stood there. He told me louder to get in the car, so I got in the car. * * *

I sat in the backseat and he drove me to different houses selling cocaine and I was sitting in the backseat. Again, in quotation she goes on, after a few hours he pulled into this driveway and he was on his phone for an hour. I saw the time and it was — the time on his phone, it was like 6:00 in the morning.

He climbed in the backseat he told me to take off my hoody. He told me to take off my shirt. I didn't want to, but he said take off your shirt before I kill you. I took off my shirt. * * *

He told me to take off my leggings. Then he raped me. He kept getting mad because I was moving and he kept holding me down.

Tr. 882-883. Doe stated that Armstrong stopped when he ejaculated "in his condom." Tr. 886.

{¶ 24} Doe also told Nurse Hackett that Armstrong stopped at a house on Union Avenue, "showered or something, [and] drove around selling cocaine." Tr. 883. "Then his friend called him to go out to a bar and then he dropped me off to 126th Street and said this is where you get out. I walked to my friend's house, and she said people was looking for me." Tr. 884. Doe said she feared Armstrong might have had a gun or knife.

{¶ 25} Nurse Hackett did not observe markings on the back of Doe's neck substantiating her statement that Armstrong held her by the back of her neck. The nurse took DNA swabs of areas Doe said Armstrong touched including her neck and stomach, and performed a genital exam that did not provide evidence of injury. The nurse did not use an alternative light source to help identify body fluids. Tr. 925. Doe informed the nurse that Armstrong never forced her to use drugs or alcohol and that she was not having issues with memory loss so that she could not recall what occurred. Tr. 931.

{¶ 26} DNA analyst Gerald Furniss of the Regional Forensic Science Office of the Cuyahoga County Medical Examiner's Office analyzed Doe's sexual assault evidence kit and clothing. No seminal DNA was matched to Armstrong. Furniss confirmed that epithelial DNA is produced from "sweat, tears, touching, things like that" and "we are all shedding cells when we touch stuff." No tests were conducted on Doe's sweatshirt or tank top. Armstrong's epithelial cells were found on a single sample from Doe's leggings but on no other items. The clothing collected from Doe was placed in a single bag. The DNA could have been transferred directly or from another item or surface.

{¶ 27} CPD Detective Tusing ("Det. Tusing") worked with the sex crimes and child abuse unit at the time of the incident. He and Det. Crosby interviewed Doe within two or three days of the incident and again a few days later after receipt of the zone car officer's incident report. Doe described Armstrong as having dreadlocks, 5 feet 9 inches to 5 feet 10 inches in height, with a tattoo that included the color red.

{¶ 28} The detective did not check area residences or businesses for video recordings of the white car described by Doe. He contacted the CPD's Real Time Crime Center ("RTCC") seeking video recordings from cameras located on Cleveland streets but did not receive a response.

{¶ 29} Det. Tusing discovered a few apartment complexes that "could have" been where the alleged rape occurred but was not sure and did not take pictures. He also identified a liquor store in the area that Doe described but did not check to see

if the store had security videos or to see whether there were other stores in the immediate area. Det. Tusing was unable to locate the house where Armstrong reportedly stopped to shower or rest. Armstrong's cell phone records were not subpoenaed because the cell phone providers do not keep records for more than a few months, and the cell phone information was not obtained until August 2020.

{¶ 30} A video of Armstrong's custodial interview conducted August 26, 2020, was played for the jury. A review of the video reveals that Armstrong said he did not recall picking anyone up the day of the incident or forcing anyone into his car and did not think he had a vehicle at that time. The detective informed Armstrong that he was arrested because his DNA was found in the rape kit, but Armstrong insisted that he was innocent.

{¶ 31} Sergeant Brian Williams ("Sgt. Williams") with the Cuyahoga County Sheriff's Office was employed as an administrator of the jail-call system. Calls are tracked by inmate account number and name and accessed by an inmate's unique PIN. Sometimes inmates traded PIN numbers and sometimes used another's PIN without permission. The call detail report for Armstrong's account covered the period of July 6, 2020, to January 28, 2023, for a total call time of 23 hours and 59 seconds. A second call detail list under the name Malik Shabazz for the period July 1, 2022, to July 31, 2022, was also identified.

{¶ 32} The call lists included a number in common. The jail call to that number from each account was played for the jury. This court's review revealed that the July 28, 2022 audio recording contained a male voice and a female voice

discussing the victim's name and allegations. The July 29, 2022 audio recording between a male and female discussed looking for "her" on Facebook and that she wore braces. The sergeant did not have actual knowledge of the identities of the individuals in the recordings. There were no other questions by the state or defense regarding the audio contents.

{¶ 33} The state rested. Armstrong's Crim.R. 29 motion for judgment of acquittal was denied. The defense rested and the renewed motion for acquittal was also denied.

{¶ 34} Appellant appeals. The state cross-appeals.

## Direct appeal

{¶ 35} Armstrong assigns two errors on appeal:

I.     Appellant's kidnapping convictions in Counts 2 and 3 were not supported by legally sufficient evidence as required by state and federal due process.

II.     Appellant's convictions were against the manifest weight of the evidence.

## Discussion

{¶ 36} We combine the assigned errors for ease of analysis.

### Standard of Review

{¶ 37} "Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the state's evidence is insufficient to sustain a conviction for an offense." *State v. Hoskin-Hudson*, 8th Dist. Cuyahoga No. 103615, 2016-Ohio-5410, ¶ 7. "[A]n appellate court reviews a trial court's denial of a defendant's motion for

acquittal using the same standard it applies when reviewing a sufficiency-of-the-evidence claim." *Id.*

{¶ 38} "'Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the jury verdict.'" *State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 23, quoting *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997).

{¶ 39} "'[W]hen reviewing the sufficiency of the evidence to support a criminal conviction'" the function of an appellate court "'is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *Id.* at ¶ 24, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds, Smith* at 102, fn. 4. "'[T]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), followed.)'" *Id.*, quoting *id.*

{¶ 40} In contrast to an appellate court's sufficiency of the evidence inquiry of whether the state met its burden of production at trial, a manifest weight of the evidence inquiry asks whether the state met its burden of persuasion. *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997) (Cook, J., concurring.)

In conducting a manifest weight inquiry, a reviewing court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Id.* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 41} When "weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the trier of fact." *Id.*, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21. Thus, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances where the evidence presented at trial weighs heavily against the conviction. *Thompkins* at 388.

**Analysis**

{¶ 42} Armstrong challenges the convictions for the kidnapping counts. Count 2 of the indictment charged under R.C. 2905.01(A)(4) that Armstrong "did, by force, threat, or deception, purposely remove Jane Doe from the place where she was found or restraining the liberty of her for the purpose of engaging in sexual activity, as defined in Section 2907.01 of the Revised Code, with Jane Doe against her will." "Furthermore, and the victim of the offense is under eighteen years of age." "[T]he offender committed the offense with a sexual motivation." R.C. 2941.147(A). Also, Armstrong "is a sexually violent predator." R.C. 2941.148(A).

{¶ 43} The indictment for Count 3, R.C. 2905.01(A)(2), provided that Armstrong, "did, by force, threat, or deception, purposely remove Jane Doe from the place where she was found or restrain the liberty of her for the purpose of facilitating the commission of a felony to wit: Rape [R.C.] 2907.02 and/or corrupting another [R.C.] 2925.02 or flight thereafter." The count includes the same specifications except for the under-the-age-of-18 specification.[1]

{¶ 44} The following exchange took place on the record regarding merger of the kidnapping convictions:

> State: Yes, one more matter before we proceed, Your Honor. In looking at Counts Two and Three the state would agree that those counts would merge, your Honor. The state would elect on Count Two a violation of (A)(4) kidnapping, felony of the first degree, punishable by three to 11, Your Honor, the sexual motivation language on Count Three which he was found guilty of in addition to the under 18 [years of age] furthermore language of Count Two, I think I may have said Count Three, of Count Two, Your Honor.
>
> What those do is they enhance the registration requirements so that this is a tier three sex registration, Your Honor.
>
> Court: Do you agree, Mr. Kucharski?
>
> Counsel: Unfortunately, I do, Your Honor.

Tr. 1385-1386.

{¶ 45} As to Count 3, this court has held that "[a] defendant cannot challenge a conviction that was merged because '[t]he counts that merged with the [count of] conviction are not convictions, and therefore, we cannot individually review the

---

[1] The sexually violent predator specifications were dismissed from the kidnapping counts prior to trial.

evidence supporting those findings of guilt.'" *State v. Banks*, 8th Dist. Cuyahoga No. 108166, 2020-Ohio-3029, ¶ 23, quoting *State v. Worley*, 8th Dist. Cuyahoga No. 103105, 2016-Ohio-2722, ¶ 23, *State v. Pollard*, 8th Dist. Cuyahoga No. 110008, 2021-Ohio-2520, ¶ 15.

> "For the purposes of R.C. 2941.25, a 'conviction' consists of a guilty verdict and the imposition of a sentence or penalty.'" (Emphasis sic.). Banks cannot challenge a conviction that does not exist. *See id.* ("The counts that merged with the [count of] conviction are not convictions, and therefore, we cannot individually review the evidence supporting those findings of guilt.").

*Banks* at ¶ 23, quoting *Worley* at ¶ 23.

{¶ 46} Thus we focus on Count 2. According to R.C. 2905.01(A)(4):

> (A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes: * * *
>
> (4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will.

{¶ 47} R.C. 2907.01(C) defines "sexual activity" as "sexual conduct or sexual contact, or both."

> (A) "Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.
>
> (B) "Sexual contact" means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.

R.C. 2907.01(A)-(B).

{¶ 48} The jury was instructed that to find Armstrong guilty of rape under Count 1, it must find that Armstrong "did engage in sexual conduct, to-wit: vaginal penetration with Doe, by purposely compelling her to submit by force or threat of force." Tr. 1331. The trial court instructed on the related terms including purpose.

> A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of defendant a specific intention to compel Doe to submit by force or threat. * * *

> A purpose is a decision of the mind to do an act with a conscious objective of producing a specific result or engaging in specific conduct. To do an act purposely is to do it intentionally and not accidentally.

Tr. 1332. The jury found Armstrong not guilty of rape.

{¶ 49} The jury was instructed as to Count 4 "that a finding of guilt must be based on determining that the defendant did knowingly by force, threat, or deception, administer to another or induce or cause another to use" marijuana. Tr. 1339. The jury found Armstrong not guilty.

{¶ 50} The jury was also advised:

> You must consider each count and the evidence applicable to each count separately, and you must state your findings as to each count uninfluenced by your verdict on any other count. The defendant may be found guilty or not guilty of none, some, or all of the offenses charged.

Tr. 1329.

{¶ 51} On Count 2 kidnapping, the trial court instructed that the jury must find that Armstrong "did by force, threat, or deception purposely remove Doe from the place where she was found or restrained the liberty of her for the purpose of

engaging in sexual activity with Doe against her will." Tr. 1334. The jury was also

advised that the definition of purpose and force were the same as those given for the

rape charge.

> A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of defendant a specific intention to compel Doe to submit by force or threat.
>
> What about conduct? When the central idea, essence or gist of the offense is a prohibition against or forbidding conduct of a certain nature, a person acts purposely if his specific intention was to engage in conduct of that nature, regardless of what he may have intended to accomplish by his conduct.
>
> A purpose is a decision of the mind to do an act with a conscious objective of producing a specific result or engaging in specific conduct. To do an act purposely is to do it intentionally and not accidentally.
>
> Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct.
>
> How should you determine this? The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means or weapon used, and all the other facts and circumstances in evidence.
>
> Compel means to force by the use of force or the threat of force, duress, or coercion of any kind.
>
> Force simply means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing.
>
> A threat means a direct or indirect threat.

Tr. 1332-1335.

{¶ 52} "R.C. 2905.01(A)(4) prohibits the removal or restraint of another for

the purpose of engaging in sexual activity with the person and 'requires only that the

restraint or removal occur for the purposes of non-consensual sexual activity — not that sexual activity actually take place.'" *Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, at ¶ 61, quoting *State v. Powell*, 49 Ohio St.3d 255, 262, 552 N.E.2d 191 (1990), *superseded by constitutional amendment on other grounds, Smith*, 80 Ohio St.3d at 102, 684 N.E.2d 668, fn. 4, and following *Jackson*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 53} In this case, the jury was not convinced that a rape occurred or that Armstrong forced Doe to consume marijuana or alcohol. Thus, the issue is whether the evidence supported that Armstrong restrained or removed Doe with the "purpose" of engaging in nonconsensual sexual activity.

{¶ 54} Doe testified that Armstrong slowly drove up slowly behind her, to her left. He never showed a weapon, made a threat, or attempted to get out of the car. He simply told her to "get in." Tr. 531. The front passenger side window was down. Doe did not observe Armstrong reach over to unlock the passenger's side of the older four-door vehicle as it was unlocked when she entered, but also stated she entered the back seat behind the driver. Defense counsel asked: "And he made no threats to you whatsoever, hasn't used force or deception, saying I've got something in here for you, right?" Tr. 533. Doe responded, "no." During the entire almost 24-hour period, Doe did not attempt to exit the vehicle or seek assistance, even when Armstrong entered a residence for approximately 45 minutes. Doe explained that she remained because she was afraid.

{¶ 55} It is true that there are conflicts between Doe's testimony and the statements made to police, but there are also consistencies. Doe was 14 years of age in November 2019, and the trial took place in January 2023. A "jury is free to believe or disbelieve all or part of any witness's testimony." *State v. Taylor*, 8th Dist. Cuyahoga No. 90044, 2008-Ohio-2663, ¶ 23, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964). The jury chose not to believe the elements of the rape count that were established, nor did they believe that Armstrong caused Doe to indulge in marijuana use. However, the jury did find that the kidnapping took place for the purpose of sexual activity. Based on a thorough review of the record, this court cannot say that the evidence was insufficient or the convictions were against the manifest weight of the evidence.

{¶ 56} The first and second assignments of error are overruled.

**Cross-Appeal**

{¶ 57} The state assigns two cross-assignments of error.[2] According to the record, Armstrong did not respond; however, Armstrong was permitted to address the assigned errors at oral argument.

> I.    The trial court's sentence was contrary to law because it failed to properly impose an indefinite term of incarceration.
>
> II.    The trial court failed to calculate the appropriate jail-time credit as required by R.C. 2929.19.

---

[2] This court granted the state's motion for leave to file the cross-appeal on June 22, 2023. The state's right to appeal is set forth under R.C. 2945.67, which provides that, with the exception of final verdicts, the state may appeal any other decision in a criminal matter by leave of court.

**Discussion**

**Standard of Review**

{¶ 58} We review felony sentences under the standard set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 16.

> R.C. 2953.08(G)(2) provides that when reviewing felony sentences, a reviewing court may overturn the imposition of consecutive sentences where the court "clearly and convincingly" finds that (1) "the record does not support the sentencing court's findings under R.C. 2929.14(C)(4)," or (2) "the sentence is otherwise contrary to law."

*State v. Henderson*, 8th Dist. Cuyahoga Nos. 106340 and 107334, 2018-Ohio-3168, ¶ 15.

**Analysis**

**Contrary to law**

{¶ 59} The record reflects at the sentencing hearing that the trial court failed to announce a minimum and maximum sentence pursuant to Reagan Tokes. Instead, the trial court imposed an eight-year term. The journal entry provides:

> The court considered all required factors of the law.
>
> The court finds that prison is consistent with the purpose of R.C. 2929.11.
>
> The court imposes a minimum prison term of 8 year(s) and a maximum prison term of 12 year(s) on the underlying offense(s) at the Lorain Correctional Institution.
>
> Count(s) 3 merge into Count 2. State elects to proceed as to Count 2, [felony one]: a prison term of 8 year(s); a mandatory minimum 2 years, up to a maximum of 5 years post release control.
>
> The state agrees the counts merge. * * *

> Reagan Tokes advisory given. Defendant's objection [to] the law is hereby overruled.

Journal entry No. 144109995, (Apr. 13, 2023) p. 1.

{¶ 60} The sentence is reversed and remanded to the trial court to properly impose and journalize the sentence pursuant to law. The first cross-assignment of error is sustained.

**Jail-time Credit**

{¶ 61} The state argues the trial court failed to calculate the appropriate jail-time credit as required by R.C. 2929.19. We sustain the assigned error for the reasons set forth below.

**Standard of Review**

{¶ 62} "'An error in the computation of jail-time credit is subject to review under R.C. 2953.08(G)(2).'" *State v. Jones*, 8th Dist. Cuyahoga No. 110412, 2021-Ohio-4175, ¶ 9, quoting *State v. Hearn*, 6th Dist. Erie Nos. E-19-067, E-19-076, E-19-077, and E-19-078, 2021-Ohio-86, ¶ 6. *See also State v. Williams*, 8th Dist. Cuyahoga No. 104155, 2016-Ohio-8049, ¶ 10. "'An appellate court may increase, decrease, modify, or vacate and remand a disputed trial court sentence if it clearly and convincingly is demonstrated that either the record of evidence does not support applicable statutory findings or the sentence is otherwise contrary to law.'" *Id.*, quoting *Hearn* at ¶ 6, citing R.C. 2953.08(G)(2).

**Analysis**

{¶ 63} In the instant case, the trial court inquired:

Court:  What jail credit is your client now entitled to [counsel]?

Counsel:  I'm not aware of the exact calculation, Your Honor.

Court:  Would you like to have a word with your client now?

(Thereupon, a discussion was had off the record.)

Counsel:  He believes he should be credited 18 months, Your Honor. He believes he has two years total, Your Honor. He has another six months from coming in and out of jail on all those [other] cases.

Court:  Two years would be 730 days. Does the state concur or have a different figure in mind?

State:  No, I would not take Mr. Armstrong at his word, Your Honor. I would request to be able to calculate that subsequently after the hearing and provide the Court with our calculation.

Tr. 1384.

{¶ 64} The trial court advised both sides to be prepared with jail-time credit figures in mind in the future.

For the moment I will give the defendant a 730-day credit. The state may by written motion move to have that figure reduced or you can add to that if that is where the facts lead them, understood?

State: Yes, Your Honor.

Tr. 1384. The defense was also invited to advise the court if it came up with a different figure.  The court asked both sides to provide their calculations by April 10, 2023.

{¶ 65} "'The practice of awarding jail-time credit, although now covered by state statute, has its roots in the Equal Protection Clauses of the Ohio and United States Constitutions.'" *Williams*, 8th Dist. Cuyahoga No. 104155, 2016-Ohio-8049, at ¶ 12, quoting *State v. Fugate*, 117 Ohio St.3d 261, 2008-Ohio-856, 883 N.E.2d

440, ¶ 7. "The rationale for giving jail-time credit 'is quite simple[;] [a] person with money will make bail while a person without money will not.'" *Id.*, quoting *id.* at ¶ 25.

**{¶ 66}** R.C. 2929.19 governs the trial court's responsibilities at sentencing hearings. R.C. 2929.19(B)(2)(g)(i) provides that "[i]t is the duty of the trial judge to determine the amount of jail-time credit to which a prisoner is entitled." *State v. Williams*, 8th Dist. Cuyahoga No. 105903, 2018-Ohio-1297, ¶ 14, citing *State ex rel. Rankin v. Ohio Adult Parole Auth.*, 98 Ohio St.3d 476, 2003-Ohio-2061, 786 N.E.2d 1286, ¶ 7. "In making a determination under division (B)(2)(g)(i) of this section, the court *shall consider the arguments of the parties and conduct a hearing if one is requested.*" (Emphasis added.) R.C. 2929.19(B)(2)(g)(ii).

**{¶ 67}** Subsequently,

[t]he sentencing court retains continuing jurisdiction to correct any error not previously raised at sentencing in making a determination under division (B)(2)(g)(i) of this section. The offender may, at any time after sentencing, file a motion in the sentencing court to correct any error made in making a determination under division (B)(2)(g)(i) of this section, and the court may in its discretion grant or deny that motion. If the court changes the number of days in its determination or redetermination, the court shall cause the entry granting that change to be delivered to the department of rehabilitation and correction without delay. Sections 2931.15 and 2953.21 of the Revised Code do not apply to a motion made under this section.

*State v. Norris*, 7th Dist. Monroe No. 14 MO 7, 2014-Ohio-5833, ¶ 20, quoting R.C. 2929.19(B)(2)(g)(iii).

**{¶ 68}** The state offers that it was the trial court's duty to calculate jail-time credit. The state also asserts the trial court's order that the state file a motion within

seven days if it deemed the figure to be incorrect is not permitted by law. While the state presents its jail-time calculation in the appellate brief, the state argues that the law does not allow the state to file a motion in the sentencing court to correct jail-credit calculation errors — only the prisoner. R.C. 2929.19(B)(2)(g)(iii). We do not find that R.C. 2929.19(B)(2)(g)(iii) is implicated here.

{¶ 69} It appears from the record that there was more than one case pending during the years the instant case was pending, which may have served as the basis for seeking input from the parties. R.C. 2929.19(B)(2)(g)(ii) empowers the trial court to entertain arguments from the parties to reach a determination of the jail-time credit entitlement and to conduct a hearing if a hearing is requested. The trial court requested input from the parties and it "determine[d] the amount of jail-time credit to which" Armstrong was entitled. R.C. 2929.19(B)(2)(g)(i). The parties were instructed to submit calculations for consideration if they disagreed with the trial court's determination based on the only information submitted. The state chose not to comply.

{¶ 70} A prisoner has the constitutional right to receive credit for the period of commitment during which the prisoner was unable to afford bail. *See Fugate*, 117 Ohio St.3d 261, 2008-Ohio-856, 883 N.E.2d 440, at ¶ 7. The sentence is reduced "by the total number of days that the prisoner was confined for any reason arising out of the offense for which the prisoner was convicted and sentenced." R.C. 2967.191(A). However, a prisoner is not entitled to a windfall, and based on a cursory review of the record, it appears that Armstrong may have been granted more

time than permitted. In light of this court's reversal of the sentence and remand for resentencing, the computation of jail-time credit shall be addressed at resentencing, and the parties shall submit the information if properly requested by the trial court under R.C. 2929.19(B)(2)(g)(ii).

{¶ 71} The second cross-assignment of error is sustained.

**Conclusion**

{¶ 72} We affirm appellant's convictions, reverse the sentence, and remand for the limited purpose of resentencing consistent with this opinion.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
LISA B. FORBES, J., CONCUR